CHAUFFEUR'S TRAINING SCHOOL, INC., Plaintiff,

v.

Richard W. RILEY, Secretary of The United States Department of Education, and the United States Department of Education, Defendants.

No. 95–CV–1082.

United States District Court, N.D. New York.

June 10, 1997.

Roland, Fogel, Koblenz & Carr, Albany, NY (Keith J. Roland, of counsel), for Plaintiff.

Thomas J. Maroney, United States Attorney, Syracuse, NY (Robert P. Brouillard, of counsel), for Defendants.

## MEMORANDUM–DECISION & ORDER

McAVOY, Chief Judge.

### I. BACKGROUND

Plaintiff Chauffeur's Training School ("CTS") is a vocational trade school offering tractor trailer driving instruction. Until September 1991, CTS participated in the Guaranteed Student Loan ("GSL") pro-

grams[1] under Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1070 *et seq.* ("Title IV"). GSL programs are administered by the Office of Student Financial Assistance Programs ("SFAP"), in the United States Department of Education ("Education").

In December 1990 and January 1991, SFAP conducted program reviews at three CTS locations: Albany, Chicago, and Houston. A final program review determination letter ("FPRD"), issued by SFAP's Institutional Participation and Review Branch on August 27, 1992, concluded that CTS was ineligible to participate in Title IV programs due to its failure to meet the "ability-to-benefit requirements" found at 34 C.F.R. §§ 668.7 and 668.14.[2] CTS was also cited for incomplete file verification practices, incorrect file review procedures, lack of financial aid transcripts, and failure to satisfy minimum required program hours. The FPRD sought repayment of $28,223,842 which SFAP claimed represented Education's actual losses for GSL funds CTS received during the years 1986–1990.

CTS appealed the FPRD, and on December 3, 1993, Administrative Law Judge Ernest Canellos dismissed the FPRD without prejudice on the ground that it had not been issued by the proper authority. On February 16, 1994, the Secretary reversed Judge Canellos's ruling and reinstated the FPRD. Upon remand, Judge Canellos denied CTS's request for an evidentiary hearing.

On September 9, 1994, Judge Canellos ruled that Education demonstrated that $205,660 in a sample of Guaranteed Student Loans were improperly issued. Judge Canellos then extrapolated that figure to the entire universe of CTS' GSL loans and held that CTS was liable for $2,056,600. Judge

Canellos also found that CTS offered an ineligible program that did not meet certain minimum required hours. Thus, CTS' total liability was found to be $2,085,008.

CTS appealed Judge Canellos' decision to the Secretary. On July 11, 1995, the Secretary issued, without opinion, a Certificate of Decision that adopted and certified the Decision issued by Administrative Law Judge Canellos.

On August 4, 1995, CTS filed the instant Complaint against Richard W. Riley, Secretary of the United States Department of Education, and the United States Department of Education challenging the Secretary's assessment of $2,085,008, seeking an injunction prohibiting Education from enforcing or seeking payment of the assessed liabilities, and a declaratory judgment setting aside the Secretary's decision. CTS also seeks relief under the Equal Access to Justice Act. *See* 28 U.S.C. § 2412.

Presently before the Court are Defendants' Motion and Plaintiff's Cross–Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## II. DISCUSSION

### A. Summary Judgment Standard & Standard of Review

■ Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a court may grant summary judgment if it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). It is the substantive law that will determine what facts are material to the outcome of a case.

---

1. As a result of the 1992 Amendments to the Higher Education Act, Pub.L. No. 102–325, the GSL programs are now known as the Federal Family Education Loan ("FFEL") programs. FFEL programs include the Federal Stafford Loan program, Federal Supplemental Loans for Students program, Federal PLUS program, and Federal Consolidated Loan Program.

2. To be eligible to receive Title IV program funds, a student must have a high school diploma or equivalent, or be above the age of compulsory school attendance in the state in which the insti-

tution is located and have the ability-to-benefit ("ATB") from the training offered by the institution. *See* 20 U.S.C. § 1091(d); 34 C.F.R. § 668.7. A student has the "ability to benefit" if, for the period prior to July 1, 1991, the student is administered a nationally recognized, standardized, or industry-developed test, subject to criteria developed by the institution's nationally recognized accrediting agency or association. *See* 20 U.S.C. § 1091(d)(3)(A); 34 C.F.R. § 668.7(b)(1).

*See Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

Initially, the moving party has the burden of informing the court of the basis of its motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The Court must then resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). However, the non-moving party must do more than simply show "that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355. Only when the Court concludes that no rational finder of fact can find in favor of the non-moving party should summary judgment be granted. *Gallo v. Prudential Residential. Servs., Ltd.,* 22 F.3d 1219, 1223 (2d Cir.1994).

Moreover, pursuant to the Administrative Procedures Act, a reviewing court generally will limit its review to whether an agency's decision was arbitrary, capricious, or not in accordance with law. *See* 5 U.S.C. § 706.[3] In determining whether an agency has acted arbitrarily and capriciously in violation of 5 U.S.C. § 706(2)(A), "a court may not 'substitute its judgment for that of an agency,'" *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971), but must determine "whether the agency's decision 'was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *State of N.Y. Dep't of Social Services v. Shalala,* 21 F.3d 485, 492 (2d Cir.1994) (*quoting Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983)).

With this standard in mind, the Court will review the parties' arguments.

## B. The Secretary's Decision

The Secretary's decision essentially encompassed five findings: (i) the Final Program Review Determination was properly authorized and issued; (ii) CTS violated Title IV program regulations by engaging in incomplete file verification practices, incorrect file review procedures, lacking financial aid transcripts, and violating ability-to benefit requirements; (iii) CTS failed to provide the 300 minimum hours of instruction in the Tractor Trailer Driver II Program at the Albany campus; (iv) SFAP may recover $2,085,008, including the face value of the guaranteed loans in the 187 student sample extrapolated to the entire universe of CTS' GSL loans; and (v) the violations of Title IV program regulations were not sufficiently serious to reach the level of loss of institutional eligibility.

In light of the fact that neither party takes issue with the Secretary's fifth finding, the Court will only address the remaining four agency findings.

### i. Was the Final Program Review Determination Properly Authorized and Issued?

In its Cross–Motion for Summary Judgment, CTS claims that the FPRD was not

---

**3.** 5 U.S.C. § 706 states, in its entirety:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

  (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

  (B) contrary to constitutional right, power, privilege, or immunity;

  (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

  (D) without observance of procedure required by law;

  (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

  (F) unwarranted by the facts to the extent that the facts are subject to trial *de novo* by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

properly issued because the agency official who signed the FPRD was not empowered to issue the final determination letter. Essentially, CTS argues that the FPRD was "issued under an attempted redelegation of authority which was specifically precluded by the reservation against further delegation in the original delegation." (Plf.'s Mem. in Support of Cross–Motion at 5). In addition, CTS argues that the FPRD is invalid because SFAP did not file a timely response to Judge Canellos' Order to Show Cause and SFAP did not appeal the dismissal to the Secretary in the time authorized.

■ In his decision reinstating the FPRD, the Secretary states: "[A] subordinate employee signed the FPRD for his immediate supervisor, the Chief of the Institutional Review Branch, the position delegated with the authority to issue FPRDs.... [T]here is no basis in the record to conclude that anyone other than the Chief of the Institutional Review Branch made the actual decision to *issue* the written notice of determination." (Complaint, Exh. B (emphasis in original)).

■ After reviewing the record on this issue, the Court cannot conclude that the Secretary's decision to uphold the FPRD was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. As to CTS' remaining arguments, it is plainly within the discretion of the Department of Education as to how it will enforce its own internal procedures. *See, e.g.,* 34 C.F.R. § 668.117(c). Thus, CTS' challenge on this ground must be dismissed.

### ii. Did CTS violate Title IV program regulations?

Judge Canellos found, and the Secretary certified, that CTS violated Title IV program regulations by engaging in incomplete file verification practices, incorrect file review procedures, lacking financial aid transcripts, and violating ability-to-benefit requirements, resulting in $205,660 in liability. The Secretary's decision raises two distinct issues. First, did CTS violate Title IV program regulations? If so, what is the correct measure of liability for the violations?

■ CTS initially argues that it was under no obligation to provide an accounting to Education. It is clear, however, that CTS conducted itself as a fiduciary in administering and accounting for the Title IV program funds. As required by statute, *see* 20 U.S.C. § 1094(a), CTS entered into a Program Participation Agreement ("PPA") with Education. In its PPA, CTS agreed to comply with all statutory provisions applicable to such programs and all applicable regulatory provisions prescribed under that statutory authority. (Hanley Aff. ¶ 5; PPA Art. II, ¶ 2). Moreover, CTS' PPA states at Article 2, paragraph 2 that "[t]he institution further agrees that it is responsible for all accounting, with appropriate documentation, for all the Title IV, HEA Program Funds it receives...." (PPA Art. II, ¶ 2).

■ As to CTS' alleged violations, SFAP's Final Program Review Determination alleged extensive violations on the part of CTS. After reviewing a sample of 187 student files, Administrative Law Judge Canellos allowed CTS to refute SFAP's determination. In his decision, which was adopted by the Secretary, Judge Canellos wrote: "CTS submitted student file records, the ATB test administered, financial aid worksheets, and miscellaneous records to address SFAP's Claims. Of the 36 ATB violations, CTS tendered evidence to refute 10; for the 20 verification problems, CTS refuted 6...." *In the Matter of Chauffeur's Training School,* U.S. Dep't of Educ., Docket No. 92–113–SP (September 9, 1994), at 3.

As to the Secretary's factual findings, this Court's review is necessarily limited. In *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985), the Supreme Court warned that "the reviewing court is not ... empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Id.* at 744, 105 S.Ct. at 1607. After reviewing the record here, the Court finds no evidence that Judge Canellos' determinations were arbitrary, capricious, or contrary to law. *See, e.g., Dopico v. Goldschmidt,* 687 F.2d 644, 654 (2d Cir.1982) (reviewing court should look for a "clear error of judgment").

Accordingly, the Court holds that the Secretary's finding that CTS violated Title IV program regulations was not arbitrary, capricious, or otherwise not in accordance with law. Thus, this aspect of the Secretary's decision cannot be set aside.

### iii. Did CTS fail to provide the 300 minimum hours of instruction in the Tractor Trailer Driver II Program at the Albany campus?

Judge Canellos found, and the Secretary certified, that CTS failed to provide 300 minimum hours of instruction in the Tractor Driver II Program at the Albany Campus. In his decision, Judge Canellos wrote: "The one allegation to which CTS made no effective challenge involved its failure to provide 300 minimum hours in the Tractor Trailer Driver II Program at the Albany campus.... CTS claims that the class was rescheduled on July 6th, but records of CTS fail to establish that such a session took place." *In the Matter of Chauffeur's Training School,* at 3. Although CTS asserts that this claim "was fully refuted in the exhibits submitted to the ALJ, and in CTS' Briefs to the ALJ and the Secretary," (Plf.'s Mem. in Opposition at 10), this Court may not substitute its judgment for that of the Secretary. *See Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. at 824. Instead, "[t]his Court can only set aside an agency action if it is found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Christianson v. Hauptman,* 991 F.2d 59, 63 (2d Cir.1993) (*quoting* 5 U.S.C. § 706(2)(A)).

After reviewing the record, it is clear that no such errors have occurred. Thus, this aspect of the Secretary's findings is also not open to challenge.

### iv. Is Education Entitled to Recover the Face Value of the Guaranteed Loans and to Extrapolate to the Entire Universe of CTS' GSL Loans?

In calculating CTS' liability to Education, the Secretary relied on Judge Canellos' calculations. Two aspects of Judge Canellos' calculations are currently in issue. First, whether Education is entitled to recover the *face value* of the GSL loans disbursed by private lenders to students at CTS. Second, whether it is proper to extrapolate CTS' liability from a review of only 187 student files.

Under Title IV's GSL program (currently the FFEL program), an eligible student receives a loan from a participating lender, such as a bank, to pay tuition and living expenses incident to the student's attendance at an eligible institution. *See* 20 U.S.C. § 1071; 34 C.F.R. § 682.100. Repayment of the loan is insured by a state or private guarantee agency, which, in turn, is reinsured by Education. *See* 20 U.S.C. § 1078(b); 34 C.F.R. § 682.404. In addition to insuring the loan, Education provides subsidies to the lenders to compensate them for below market interest rates; Education also pays the holder of the loan interest during the period in which a qualifying student borrower is attending school on at least a half-time basis and is otherwise eligible. *See* 34 C.F.R. §§ 682.209, 682.300. However, as Education itself points out: "Although Education reinsures and subsidizes loans, it is important to note that it does not make loans to students [directly.] Instead, a student secures the loan from a commercial lender...." (Def.'s Mem. of Law in Support of Summary Judgment at 3).

CTS challenges the imposition of full face-value liability on the grounds that Education's implementing statutes do not give the Secretary authority to require repayment of Guaranteed Student Loans that have been issued by third-party lenders. Instead, CTS asserts that DOE regulations in effect at the relevant time specified that in the event of an institution's failure to administer Title IV programs, or to account for the funds received under those programs, such conduct only "constitutes grounds for a fine, or the suspension, limitation, or termination of the eligibility of the institution to participate in those programs." 34 C.F.R. § 668.82.

■ After a review of the relevant regulatory and statutory provisions, the Court agrees. Although Congress gave Education the authority to recover improperly used *grant* funds, *see* 20 U.S.C. § 1234a, there does not appear to be a similar grant of authority for Education to recover funds pro-

vided by third-party private lenders. As CTS correctly notes, the distinction between the two situations obviates the expansion of Education's power. In the case of a grant, once Education transfers the funds to the recipient, it has suffered a direct "injury" by the transfer of monies from the federal fisc. In comparison, Education may never be called upon to repay the face value of the GSL loans. Education's role is simply that of reinsurer; if the student honors the repayment terms or if the original guarantee agency collects on a defaulted loan, Education will not be obligated to cover the principle of these loans.

■ Absent statutory authority to recover the full face-value of the GSL loans provided by third-party lenders, it is an improper exercise of the Secretary's power to require CTS to repay the GSL loans disbursed to CTS' students.[4] As stated in *Manhattan General Equipment Co. v. Commissioner*, 297 U.S. 129, 134, 56 S.Ct. 397, 399, 80 L.Ed. 528 (1936):

> The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law—for no such power can be delegated by Congress—but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity.

297 U.S. at 134, 56 S.Ct. at 399. Accordingly, the Secretary's calculation of CTS' liability, based on the face value of CTS' GSL loans, must be set aside.

■ The question remains, however, as to CTS' proper liability for its Title IV violations. Plainly, under breach of contract principles, Education is entitled to recover its actual damages associated with the ineligible GSL program loans, including, *inter alia*, reinsurance payments, claims paid upon defaulted loans, and interest and other subsidies paid to participating lenders. *See* 5 Corbin on Contracts § 1002 (1964). In addition, Education may be able to recover civil penalties pursuant to 20 U.S.C. § 1094.

On the issue of Education's actual losses associated with the ineligible GSL program loans, the parties are in significant disagreement. Apparently in an effort to aid the Court on this issue, Education submitted, in support of its reply memorandum,[5] an affidavit by Kenneth M. Hyde, a Management and Program Analyst in the Administrative Actions and Appeals Division, Institutional Participation Oversight Service. Hyde's affidavit lays out Education's "estimated actual loss formula," a complex set of calculations that Education ostensibly uses to measure its projected financial loses.

In response, CTS vehemently objects to Hyde's affidavit, and has moved to strike the affidavit. CTS argues that "[i]t is both inequitable and improper for DOE to have refused to answer plaintiff's interrogatories, affirmatively state that they would rely exclusively on the record before the administrative agency, and then submit the declaration of Kenneth M. Hyde concerning damages." (Plf's Mem. in Support of Cross–Motion to Strike at 2).

■ It appears that Education's recent calculation of its "contingent liabilities," in the amount of $1,850,542, was never before Judge Canellos or the Secretary. In light of this Court's rejection of the Secretary's reliance on the face value of the GSL loans in the calculation of CTS' liabilities, and in light of the complexity of Education's proffered "estimated actual loss formula," the Court remands the calculation of damages to the

---

4. This conclusion would not change even if Education were able to point to a specific *regulation* authorizing the recovery of the face value of GSL loans. A regulation may not serve to amend a statute, *see Iglesias v. U.S.*, 848 F.2d 362, 366 (2d Cir.1988), or to add to the statute "something which is not there." *United States v. Calamaro*, 354 U.S. 351, 359, 77 S.Ct. 1138, 1143, 1 L.Ed.2d 1394 (1957).

5. The Court also notes that in its reply papers, Education not so subtly changed its nomenclature concerning its claim for $2,085,008 in damages from "actual losses" to the new term, "contingent liabilities." Thus, Education recognizes, at least implicitly, that its "actual loses" are not $2,085,008. Instead, Education now argues that its "contingent liabilities" amount to $1,850,542. (Hyde Aff. ¶ 17).

Secretary. Moreover, this remand will provide CTS with the opportunity to contest Education's loss formula and calculations.

As a final matter, CTS challenges Education's extrapolation of violations from the 187 students reviewed to the entire universe of GSL program loans disbursed to CTS students.[6] CTS essentially makes three arguments: Education lacks the authority to use statistical extrapolation, CTS had no prior notice of this methodology, and the methodology is flawed.

■ Education argues that the use of this projection is a straightforward application of the Secretary's authority to collect improperly disbursed funds. *See* 34 C.F.R. § 682.609(a). In addition, Education cites numerous cases were courts have upheld an agency's decision to project sample liabilities to a larger universe in determining program liabilities. *See, e.g., Yorktown Med. Lab. v. Perales,* 948 F.2d 84 (2d Cir.1991); *Michigan Dep't of Educ. v. United States Dep't of Educ.,* 875 F.2d 1196, 1205 (6th Cir.1989); *Commonwealth of Mass. Dep't of Public Welfare v. Sec'y of Agriculture,* 984 F.2d 514, 521–22 (1st Cir.1993). Although these cases did not specifically involve Title IV program loans, they are nevertheless apposite here. Indeed, government agencies would be hamstrung without the ability to rely on review sampling. Thus, the Court holds that the Secretary possesses the authority to use statistical extrapolation to calculate liability.

CTS raised its other sampling concerns in its appeal to the Secretary. However, the Secretary's decision does not address those concerns. In fact, neither Judge Canellos nor the Secretary provide any support in the record for this Court to determine the appropriateness of Education's extrapolation.

■ Although the scope of this Court's review is narrow, Education must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. *See Motor Vehicle Manufs. Ass'n of the U.S. v. State Farm*

*Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). Furthermore, in reviewing that explanation, we must be able to "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Bowman Transp. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). As the Ninth Circuit has stated: "The administrative record ... must sufficiently provide a clue to the agency's decisionmaking analysis for such review to be meaningful. This court should not supply a reasoned basis for the agency's action that the agency itself has not given." *Sears Sav. Bank v. Federal Sav. and Loan Ins. Corp.,* 775 F.2d 1028, 1029 (9th Cir.1985) (*citing SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)).

Accordingly, the Court must conclude that CTS was denied the ability to challenge Education's sampling and extrapolation methodology—a methodology upon which CTS' liabilities were significantly predicated. The Court does not mean to imply that the specific extrapolation methodology used was improper, particularly in light of CTS apparent refusal to perform its own full file review. Rather, inadequate evidence in the record to support this aspect of the Secretary's decision precludes a finding that the Secretary's decision was not arbitrary or capricious.

Where, as here, the record is inadequate to allow meaningful judicial review, the Court should remand to the agency for further findings. *See Citizens to Preserve Overton Park,* 401 U.S. at 420, 91 S.Ct. at 825; *Sierra Club v. U.S. Army Corps of Engineers,* 772 F.2d 1043, 1053 (2d Cir.1985); *Sears Sav. Bank,* 775 F.2d at 1030 ("If the administrative record is inadequate to explain the action taken, the preferred practice is to remand to the agency for amplification.").

---

6. Specifically, Judge Canellos estimated that the 187 student files actually sampled represented 10% of the total number of GSL program loans at CTS. Thus, Judge Canellos estimated the total number of violations by multiplying the number of sample violations by ten.

## C. Due Process

CTS also argues that the Secretary's decision should be overturned because CTS was denied the right to a full evidentiary hearing. Specifically, CTS argues that the relevant statute in force and principles of due process require that Education provide an on-the-record evidentiary hearing.

▮ In response, Education correctly points out that section 490(b) of the Higher Education Amendments of 1992, Pub.L. No. 102–325, specifically amended section 487(b)(2) of the HEA to delete the phrase "on the record." *See* 20 U.S.C. § 1094(b)(2) (1993). Therefore, CTS' appeal was appropriately conducted under the amended statute because the FPRD was not issued until August 27, 1992, after the effective date of the 1992 amendments.

Under Education's regulations, an institution may appeal an adverse FPRD to Education's Office of Higher Education Appeals. *See generally* 34 C.F.R. § 668. The administrative appeal is conducted under Education's regulations as a "paper hearing," consisting of the submission of evidence and written briefs to the hearing official, with oral argument allowed if required or requested. *See* 34 C.F.R. § 668.116. The hearing official is required to issue an initial decision setting forth the basis of his findings and conclusions. *See* 34 C.F.R. § 668.118(d). Each party can appeal the initial decision to the Secretary, who may affirm, modify, reverse, or remand the initial decision to the hearing official. *See* 34 C.F.R. § 668.120.

In this instance, there is no evidence that Education failed to follow the above procedures in handling CTS' appeal of the FPRD. Although CTS' requests for an evidentiary hearing were denied, CTS' appeal was appropriately conducted under the relevant statutes in force at the time of the FPRD. *See* 20 U.S.C. § 1094(b)(2).

CTS' second challenge to Education's appeal procedures is that due process requires a full evidentiary hearing. Specifically, CTS appears to be arguing that Education's "paper hearing" was insufficient because CTS was precluded from calling and cross-examining witnesses directly.

▮ In response, Education argues that CTS has no property interest in the $2,085,-008 it seeks to recover. This argument carries little weight. Unlike the cases that Education cites in support of its argument, this is not a case about government benefits or CTS' continued participation in a government subsidy. Instead, Education is attempting to recover loan proceeds that were paid to CTS by its students to cover the costs of those students' educations. CTS clearly has a property interest in retaining the funds in its accounts.

Consequently, CTS has a constitutionally protected property interest in the money sought by Education, and thus it is entitled to some form of hearing before being deprived of that interest. However, "due process rarely demands full evidentiary hearings." *U.S. v. Staula*, 80 F.3d 596, 601 (1st Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 156, 136 L.Ed.2d 101 (1996); *see also Boddie v. Connecticut*, 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971) ("[t]he formality and procedural requisites for the hearing [required under the Due Process Clause] can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings") (footnote omitted).

▮ In *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18, (1976), the Supreme Court outlined the criteria by which to evaluate whether the administrative procedures provided are constitutionally sufficient:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. at 903.

▮ Generally, unless an evidentiary hearing is required by statute, an agency has considerable discretion in deciding how to proceed. *See Washington v. Office of the*

*Comptroller of the Currency,* 856 F.2d 1507, 1512 (11th Cir.1988) ("Since the OCC is not required by statute to hold a public hearing [the] denial of a hearing may be reviewed only to determine whether the decision was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.")

▮▮▮ Turning to the *Mathews* factors, the Court notes that although CTS' interest is substantial, the risk of erroneous deprivation through the procedures used is not sufficiently great to warrant a full, formal evidentiary hearing. Determining whether CTS lacked financial aid transcripts, engaged in incomplete file verification practices, maintained incorrect file review procedures, or failed to satisfy minimum required program hours is wholly a "paper based" review. Furthermore, calculating loan balances, interest subsidies, and reinsurance fees is largely a mathematical determination. When a determination is for the most part based upon objective, documentary evidence, there is less reason to fear that lack of a formal evidentiary hearing will result in an erroneous decision. *See. e.g., Mathews,* 424 U.S. at 343–44, 96 S.Ct. at 906–07; *Eguia v. Tompkins,* 756 F.2d 1130, 1138–39 (5th Cir.1985); *Ciechon v. City of Chicago,* 634 F.2d 1055, 1059 (7th Cir.1980).

Furthermore, when a participating institution is required to perform these file checking functions before it certifies a student as eligible for GSL program loans, it is reasonable to infer neglect when the files are not in order. In addition, resolution of the dispute here does not depend upon assessment of the credibility of witnesses.[7] *See Mathews,* 424 U.S. at 343–44, 96 S.Ct. at 906–07; *Califano v. Yamasaki,* 442 U.S. 682, 696–97, 99 S.Ct. 2545, 2555, 61 L.Ed.2d 176 (1979).

▮▮▮ Moreover, additional or substitute procedural requirements would entail unnecessary fiscal and administrative burdens on the Department of Education. As already noted, the issue of student eligibility for GSL program loans is essentially a "paper record"

dispute. To require Education to perform a full evidentiary hearing whenever an institution contests an adverse finding would be an undue administrative burden—a burden due process does not demand. In those few instances where disputed issues of fact warrant a full evidentiary hearing, it is within the discretion of an Administrative Law Judge to make that determination, or state on the record why no such hearing is warranted. *Cf. Calvin v. Chater,* 73 F.3d 87, 91–92 (6th Cir.1996) (decision to grant or deny cross-examination rests in the sound discretion of the agency).

Finally, it should be noted that although CTS did not receive a full evidentiary hearing, it did receive an informal hearing before Administrative Law Judge Canellos prior to the adverse administrative action. In that hearing, CTS was capable of defending its file verification practices through written documentation and briefing. After consideration of the aforementioned factors, the Court holds that the constitutional guarantee of due process of law did not require a full evidentiary hearing.

## III. CONCLUSION

In summary, the Court finds that the Secretary's decision to uphold the FPRD and the Secretary's conclusion that CTS violated Title IV program regulations was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. However, the Secretary's calculation of CTS' liability, based on the face value of CTS' GSL loans, was an abuse of discretion and must be set aside. In addition, there is inadequate evidence in the record to support the Secretary's decision to extrapolate CTS' liability from a review sample of 187 students.

For the foregoing reasons, Defendants' Motion for Summary Judgment and Plaintiff's Cross–Motion for Summary Judgment are GRANTED IN PART and DENIED IN PART, consistent with this Order. This case is REMANDED to the Secretary of Edu-

---

7. CTS does argue witness credibility issues, including, *inter alia,* that Education's file reviewers were "biased" against CTS. Although the Court fails to see how any biased findings by Education's reviewers could not be refuted by objec-

tive evidence in CTS' student files, it would be prudent on the part of the Secretary to state in his decision, in light of CTS' request for a full evidentiary hearing, why a full evidentiary hearing is not necessary.

cation for reconsideration and further proceedings consistent with this opinion. All other requests for relief are denied.

**IT IS SO ORDERED.**